## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | **03 C 104** | **DATE** | Oct. 25, 2004 |
| **CASE TITLE** | Kay Marchioni  v  Board of Education | | |

**MOTION:**  [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Hearing

(5) ☐ Status hearing

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ▪ [Other docket entry]

Memorandum opinion and order entered. Accordingly, defendant Board's motion for summary judgment is granted as to count I, counts IV through IX, and count XII, and denied as to count II. Defendant Hassan's motion for summary judgment is granted as to count X and count XII.

(11) ▪ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| X | Notices mailed by judge's staff. | | OCT 2 6 2004 | | 77 |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | GMA | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| GS | courtroom deputy's initials | | date mailed notice | | |
| | | | mailing deputy initials | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KAY MARCHIONI              )
           Plaintiff,     )
                        )    No.    03 C 0104
      v.                     )
                        )    Judge Robert W. Gettleman
BOARD OF EDUCATION OF THE CITY   )
OF CHICAGO and OKAB HASSAN     )
                        )
         Defendants.    )

**DOCKETED**
OCT 2 6 2004

## MEMORANDUM OPINION AND ORDER

In her twelve-count first amended complaint, plaintiff Kay Marchioni asserts violations of

Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§2000e et seq., the First

Amendment, and Illinois Tort law against the Board of Education of the City of Chicago (the

"Board") and school principal Okab Hassan ("Hassan"), arising from plaintiff's employment at

the Peck Elementary School ("Peck").[1]

Defendant Board has moved for summary judgment under Fed. R. Civ. P. 56 on all

counts against the Board: Count I (quid pro quo sexual harassment); Count II (sexual harassment

- hostile work environment); Count IV (sex discrimination); Count V (religious discrimination);

Counts VI-IX (retaliation); and Count XII (§1983 First Amendment violation). Defendant

Hassan has moved for summary judgment on Count X (defamation) and Count XII (§1983 First

Amendment violation). Hassan has not challenged the remaining counts against him, Count III

(assault and battery) and Count XI (intentional infliction of emotional distress). For the reasons

discussed herein, the Board's motion for summary judgment is granted as to Counts I, IV, V, VI

---

[1]Plaintiff's original complaint against the Board and Hassan alleged seven counts of Title
VII violations, one count of assault and battery, and one count of defamation. On March 13,
2003, the court granted the Board's motion to dismiss all counts without prejudice.

though IX, XII, and denied as to Count II. Hassan's motion for summary judgment is granted as to Counts X and XII.

<h1 style="text-align:center">FACTS[2]</h1>

Plaintiff began working for the Chicago Public Schools ("CPS") in 1986, and began teaching at Peck in February 2001 under the supervision of school principal Hassan. Plaintiff taught second-grade and pre-kindergarten classes.

Plaintiff first sought employment with the Board on April 25, 1986, by submitting an application for a temporary teaching certificate. In March and April 1987, plaintiff was convicted of in two separate jury trials of three felony counts of attempted theft in Ohio. Plaintiff was involved in a scheme in which merchandise was ordered using a stolen credit card and delivered to a vacant house. Plaintiff's convictions were affirmed on appeal on October 12, 1988. Plaintiff applied to the Board for a regular teaching certificate on September 28, 1987. In

---

[2]Unless otherwise noted, the following facts, taken from the parties' L.R. 56.1 Statements and attached exhibits, are not in dispute. The court notes that a significant number of plaintiff's responses to defendants' statements of facts are either non-responsive or argumentative. See, e.g., ¶¶ 8-10, 12, 32-35. In these instances, the court treats the facts stated by defendants as admitted. See L.R. 56.1(a) & (b)(3)(B); McGuire v. United Parcel Service, 152 F.3d 673, 675 (7th Cir. 1998) ("An answer that does not deny the allegations in the numbered paragraph with citations to supporting evidence in the record constitutes an admission.") In addition, plaintiff improperly submitted her own statement of uncontested facts("Plaintiff's Facts") which contains 190 paragraphs. Under L.R. 56.1(b), an opposing party may submit "additional facts that require the denial of summary judgment." Plaintiff's Facts, however, is mistitled and not in compliance with L.R. 56.1(b), because it not limited to required facts, or even to facts. See, e.g., ¶¶ 1-18, 29-33, 35-40, 43, 51, 77, 114-120. Moreover, it is replete with impermissible speculation, double and triple hearsay, unrelated and inflammatory documents, such as the terrorism indictment of an individual who was allegedly a substitute teacher at Peck, and conclusions of law. The court will not take the time to identify each improper response and inadmissible statement, but notes that it will not consider the portions of plaintiff's response and Plaintiff's Facts that are not in compliance with L.R. 56.1. Plaintiff's counsel, Brian R. Holman, is admonished that any future disregard of this court's rules will result in appropriate sanctions.

response to the question on the application, "Have you ever been convicted of a crime? (Do not include Minor Traffic Violations)?" plaintiff checked the box marked "No." Plaintiff signed an affirmation that the information in the application was true to the best of the applicant's knowledge. By letter dated October 18, 1989, the State of Ohio revoked plaintiff's teaching certificates as a result of her criminal convictions. Plaintiff claims she never received this letter. Plaintiff submitted an application for certification with the Illinois State Board of Education on June 27, 1990. In response to the question on the application, "Have you, in Illinois or any other state,...ever had a certificate revoked?" plaintiff checked "No." She also responded "No" to the question, "Have you ever been convicted of a felony?" Plaintiff affirmed the application.

Plaintiff claims that on May 9, 2002, she went to Hassan's office to get more tissues for her classroom. While they were alone in Hassan's office, plaintiff claims that Hassan held her hand after she retrieved the tissues and questioned her about her love life. Plaintiff claims that on May 13, 2002, Hassan called plaintiff into his office, berated her about her work performance, and then made comments about women's menstrual cycles, offered her better working conditions in exchange for sexual favors, pinned her arms in an unwelcome embrace, and thrust his pelvis against her several times as she tried to leave his office. Plaintiff reported the May 13, 2002, sexual harassment incident to Larry Laughlin ("Laughlin"), a field representative for the Chicago Teachers' Union ("CTU"), on the day of the incident. Plaintiff sent a fax regarding the May 13 incident to Laughlin on May 14, stating that "Hassan made several explicit and definite sexual advances" to plaintiff while she was in his office, and that she "had to leave his office with him hanging on to [plaintiff]." Hassan denies that either incident took place.

3

Defendants claim that on May 28, 2002, Hassan received complaints from parents of plaintiff's students regarding plaintiff's teaching performance, plaintiff's use of demeaning language in the classroom, and plaintiff's corporal punishment of students. Plaintiff alleges that Hassan did not receive calls from parents, but rather asked parents of her students to meet with him or approached parents at the school, and demanded that they say negative things about plaintiff. On May 29, 2002, Hassan wrote a letter to Yvonne Jones at the CPS Office of Schools and Regions stating that on May 28, 2002, he had received numerous phone calls from parents alleging child abuse in plaintiff's classroom, and that these allegations were supported by the parent-tutor who was present in the classroom at the time of the alleged incidents. According to an incident report prepared by Hassan dated May 29, 2002, many children indicated they were verbally abused by plaintiff, some of them indicated physical abuse, and some reported that plaintiff referred to Hassan as a terrorist and said that Hassan has a spanking machine in the office.

Hassan removed plaintiff from her classroom duties on May 30, 2002, in accordance with general Board procedures regarding pending investigations of teacher misconduct. Hassan wrote a letter to plaintiff, dated May 30, 2002, that notified her of the charges against her and that a pre-discipline hearing was scheduled for June 4, 2002. Plaintiff claims she did not receive this notice. Hassan reassigned plaintiff to non-classroom duties from May 31, 2002, until June 3, 2002, which included counting and separating boxes of books that were stored in the gym.

On May 30, 2002, plaintiff made a complaint to the inspector general's office. The inspector general is an independent investigative body established by Illinois statute to conduct

4

investigations originating from financial improprieties.[3]  At the May 30, 2002, meeting with James Sullivan ("Sullivan") at the inspector general's office plaintiff made various allegations against Hassan, including that Hassan sexually harassed her on May 13, 2002, that Arab organizations held meetings at Peck during school hours, and that Hassan collected contributions from staff and others without specifying the recipients of the money.  On June 11, 2002, plaintiff made a complaint regarding sexual harassment against Hassan to Corrine Leak, the Board's Title IX Officer.

The abuse charges against plaintiff were investigated by Board investigator John Connolly ("Connolly").  Connolly interviewed plaintiff, Hassan, the parent-tutor who was in plaintiff's classroom, and several of plaintiff's second-grade students.  In his report dated July 19, 2002, Connolly substantiated three allegations against plaintiff: (1) that she used inappropriate language to describe Hassan's national origin and creed to her students; (2) that she physically abused two male students; and (3) that she made abusive, inappropriate verbal comments to several students.  On September 12, 2002, an investigator from the Ohio Department of Education called the Board's inspector general's office and notified the office that plaintiff's Ohio teaching certifications had been revoked based on a criminal conviction.  Sullivan, an inspector general for the Board, conducted an investigation of plaintiff's prior convictions.  In his report, dated October 4, 2002, Sullivan substantiated the charge against plaintiff that she provided false information on her employment applications.

---

[3]Plaintiff attempts to divert the court's attention by disputing the independent position of the Inspector General.  105 I.L.C.S 5/1B-22 explicitly states that the  Inspector General "shall be independent of the operations of the [school district financial oversight panel] and the Board."

On February 7, 2003, the Board brought dismissal charges against plaintiff, alleging twelve separate violations of the CPS's Employee Discipline Code, including verbal and physical abuse and falsifying employment application materials. A full evidentiary hearing on plaintiff's dismissal was held before hearing officer George Larney ("Larney") in July and August of 2003. Larney's opinion, dated June 18, 2004, found that the Board had sufficient and just cause to terminate plaintiff based on her falsification of employment records. Larney further stated that he did not reach the merits of the other eleven charges because his findings on the falsification charge were sufficient to recommend dismissal.

During the period from plaintiff's reassignment through her termination, Hassan wrote several letters and memos to administrators at the Board, CPS and the Chicago Principals' and Administrators' Association[4] ("Principals' Association") advising them of his concerns regarding plaintiff and alleging several instances of misconduct by plaintiff. Plaintiff alleges that two of these communications contained defamatory statements: a June 11, 2002, memo; and a February 28, 2003 letter. Hassan sent the June 11, 2002, memo to the president of the Board, the chief executive officer ("CEO") of CPS, the chief education officer of CPS, and a regional education officer. The memo stated, among other things, that plaintiff was "a troubled and dangerous teacher" who was "abusing the children within the system." Hassan sent the February 28, 2003, letter to the president of the Principals' Association, with copies to the president of the Board, the CEO of CPS, the chief education officer of CPS, and an area education officer. Hassan's letter stated that plaintiff was contacting Peck employees and "offering them money in return for false

---

[4]In his affidavit, which plaintiff does not contradict, Hassan states that they Principals's Association was acting on his behalf "on matters related to [his] employment for the Board."

testimony." The letter also stated that plaintiff was in the process of being dismissed by CPS for "abuse of children," and that she was "a convicted felon in another state."

## **SUMMARY JUDGMENT STANDARD**

A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Unterreiner v. Volkswagen of America, Inc., 8 F.3d 1206, 1209 (7th Cir. 1993). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Becker v. Tenenbaum-Hill Associates, Inc., 914 F.2d 107, 110 (7th Cir. 1990). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. See Fisher v. Transco Services-Milwaukee, Inc., 979 F.2d 1239, 1242 (7th Cir. 1992).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Stewart v. McGinnis, 5 F.3d 1031, 1033 (7th Cir. 1993). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

7

## DISCUSSION

**I.    Sexual Harassment - <u>Quid Pro Quo</u> (Count I)**

In Count I of her first amended complaint, which is against the Board, plaintiff alleges

that the incident of May 13, 2002, constituted <u>quid pro quo</u> harassment because Hassan offered to

cease his negative behavior toward plaintiff in exchange for sexual favors.  In particular, plaintiff

alleges that Hassan asked her to dance on his desk, invited plaintiff into his private bathroom

with him, and thrust his pelvis against her while grabbing her arms.  Plaintiff further alleges that

after she refused Hassan's sexual advances, his treatment of her "deteriorated rapidly."

<u>Quid pro quo</u> harassment in violation of Title VII occurs in situations "where submission

to a supervisor's sexual demands is made a condition of tangible employment benefits." <u>Bryson</u>

<u>v. Chicago State Univ.</u>, 96 F.3d 912, 915 (7th Cir. 1996).  The Seventh Circuit has identified a

five-factor test as a "useful framework" for a <u>quid pro quo</u> analysis, in which plaintiff must show:

(1) that she or he is a member of a protected group; (2) the sexual advances were unwelcome, (3)

the harassment was sexually motivated; (4) the employee's reaction to the supervisor's advances

affected a tangible aspect of her appointment; and (5) respondeat superior has been established.

<u>Id.</u>  In the instant case, the court's decision turns on the fourth element: what was the "tangible

employment benefit" that was denied to plaintiff, and was the denial a result of her refusal to

submit to Hassan's demands?

In her first amended complaint, plaintiff alleges that Hassan's treatment of her

deteriorated after the May 13, 2002, incident.  Plaintiff indicates that the poor treatment

culminated in an injury to her foot while moving books as part of the non-classroom duties

plaintiff was assigned to after she was removed from her classroom on May 28, 2002.  Hassan

8

and Patricia Doyle, an assistant principal at Peck, both testified that plaintiff was assigned to sort books in the school gymnasium, but that she specifically instructed plaintiff not to lift or move the books. Plaintiff claims she received oral instructions from Hassan to move the books, and injured her foot while doing so. Even assuming plaintiff's foot was injured while moving books, there is no evidence of a connection between her assignment to catalogue books as part of her non-classroom duties, and her denial of Hassan's sexual advances.

The Board concedes that dismissal is clearly a "tangible employment action," but argues that plaintiff is unable to meet her burden to show a causal relationship between plaintiff's dismissal and plaintiff's reaction to Hassan's alleged advances. Plaintiff misrepresents Hassan's argument when she states, "Defendant Hassan also concedes that Plaintiff's reassignment on May 28, 2002 constitutes an adverse action." Contrary to plaintiff's characterization, Hassan concedes only that reassignment "may" constitute an adverse action, but argues that with respect to plaintiff's First Amendment claim, it does not because plaintiff fails to produce evidence of a connection between plaintiff's speech and her reassignment. The court accepts Hassan's argument with respect to the First Amendment claim (discussed below), and rejects plaintiff's argument here for similar reasons. There is no evidence connecting plaintiff's termination, which was effected by the Board following its investigation and substantiation of charges of serious misconduct by plaintiff, and her refusal of Hassan's alleged sexual advances on May 13, 2002.

Plaintiff points to Hassan's statement of facts, in which he admits that plaintiff was damaged by Hassan's conduct. It appears that Hassan's admission is the result of a typographical error. Hassan's statement of fact quotes and cites to plaintiff's deposition, indicating that Hassan

intended to represent plaintiff's allegations, not to admit a fact. Even if Hassan's admission was accepted as genuine, it is not binding on the Board. See Keller v. United States, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995). Apart from pointing to Hassan's apparently mistaken admission, plaintiff offers no evidence that Hassan was responsible for the decision to reassign or terminate plaintiff. Such a link is a critical element of a quid pro quo harassment claim. Many of the cases cited by plaintiff actually support the Board's position by emphasizing the need for evidence that the alleged harasser was involved in the decision to take the employment action. For example, Murray v. Chicago Transit Authority, 252 F.3d 880, 888 (7th Cir. 2001), cited by plaintiff, affirms summary judgment for the defendant, finding that the plaintiff's speculation that the alleged harasser was involved in the decisions to reassign the plaintiff and deny her a promotion was insufficient to sustain a claim. Here, Hassan was acting on instructions of the CPS Office of Schools and Regions when he reassigned plaintiff, and the Board, not Hassan, brought and sustained dismissal charges against plaintiff.

Because plaintiff here has failed to produce any evidence of a causal connection between the incident of May 13, 2002, and her reassignment, which was triggered by allegations of child abuse against plaintiff, or her dismissal, which was triggered by her falsified applications for teaching certification, she cannot sustain her quid pro quo claim. For these reasons, the court grants summary judgment for the Board on Count I.

## II.    Sexual Harassment: Hostile Work Environment (Count II)

In Count II of her first amended complaint, plaintiff alleges that the Board violated Title VII by subjecting her to a hostile work environment created by Hassan's alleged sexual harassment. To establish a prima facie case of a hostile work environment due to sexual

10

harassment, a plaintiff must demonstrate that: (1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (2) the harassment was based on plaintiff's sex; (3) the sexual harassment had the effect of unreasonably interfering with plaintiff's work performance in creating an intimidating, hostile, or offensive working environment that seriously affected the psychological well-being of plaintiff; and (4) there is a basis for employer liability. McPherson v. City of Waukegan, 379 F.3d 430, 437-38 (7th Cir. 2004); Hall v. Boudine Electric Co., 276 F.3d 345, 354-55 (7th Cir. 2002).

Plaintiff has set forth sufficient evidence establishing the first, second, and fourth elements of a hostile work environment claim. Hassan allegedly harassed plaintiff with sexually suggestive comments, offensive remarks, and unwanted touching, and made sexual advances toward plaintiff on one occasion. Hassan's remarks were sexual in nature and based on plaintiff's gender. Finally, under the fourth element, the Board is strictly liable for Hassan's conduct because he was a supervisory employee. The Board does not dispute that plaintiff has met her burden on these three elements, but argues that plaintiff fails to satisfy the third element.

A hostile environment is one that is "permeated with discriminatory intimidation, ridicule, and insult," that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, 510 U.S. 17, 21 (1993), citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986). Not all inappropriate behavior in the workplace rises to the level of a hostile environment. The Supreme Court held in Meritor that for the behavior to be actionable, the plaintiff must prove that it is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and

create an abusive working environment. 477 U.S. at 67. A hostile work environment claim should be judged by both an objective and subjective standard. <u>Harris</u>, 510 U.S. at 21. The work environment cannot be described as "hostile" for the purposes of Title VII unless a reasonable person would find it offensive and the plaintiff actually perceived it as such. <u>Hostetler v. Quality Dining, Inc.</u>, 218 F.3d 798, 807 (7th Cir. 2000).

Plaintiff sufficiently alleges that she perceived her work environment as hostile as result of the harassment. She testified at her deposition that the May 13 incident was "a terrible thing." The Board argues that plaintiff's failure to report the incident immediately and her return to her teaching duties lessen the credibility of her statement that she was "in shock," but according to plaintiff she called Laughlin, her union representative, soon after she was finished teaching for the day. Plaintiff's actions demonstrate a concern about Hassan's conduct and an unwillingness to tolerate further harassment.

The Board contends that plaintiff fails to raise a triable issue of fact whether the work environment was objectively hostile. Plaintiff argues, and the court agrees, that the two alleged incidents of Hassan's sexually-oriented questions, comments, propositions, and inappropriate touching of plaintiff establishes a genuine issue of material fact as to whether a reasonable person would have considered his conduct to create a hostile work environment. The Seventh Circuit has held that harassment must be severe <u>or</u> pervasive to be actionable. That is, one extreme act of harassment may rise to an actionable level, as could a string of less severe acts. <u>Smith v. Sheahan</u>, 189 F.3d 529, 534 (7th Cir. 1999). In instances where the alleged activity is not pervasive, courts most frequently find that actual sexual harassment arises from acts of impermissible touching, overt sexual assault, or injury from the "sexual" intrusion. In <u>Smith</u>, the

court held that a single attack on the plaintiff, which involved explicit language and a physical assault serious enough that the injuries to the plaintiff's arm required surgery, precluded summary judgment on the hostile work environment claim. Hostetler, 218 F.3d at 809, reversed summary judgment for the defendant where the defendant forced his tongue into the plaintiff's mouth on one occasion, and when the defendant attempted to repeat this assault and the plaintiff resisted, the defendant began to unfasten her bra. Hostetler places special emphasis on the fact that the physical harassment involved forcible unwelcome contact with intimate parts of the plaintiff's body. Id.

Plaintiff cites the May 13, 2002, incident in Hassan's office as a severe incident of harassment, analogous to that in Smith. A reasonable jury could find that Hassan's alleged behavior on May 13 - requesting a female employee to come to his office, asking that she dance on his desk in exchange for better working conditions, inviting her into his private bathroom with him, and physically restraining her while thrusting his pelvis against her - was sufficient to establish hostile work environment that was severe enough to alter the terms of her employment even though it was a single incident. Plaintiff does not cite to Hostetler, but as in Hostetler, plaintiff alleges that forcible, intimate contact occurred when Hassan thrust his pelvis against her as her held her close to him.

Even if the court found that the May 13, 2002, incident alone was not sufficient to create a hostile work environment, plaintiff cites another instance of sexual harassment only four days before May 13. Plaintiff alleges that on May 9, also while she was alone with Hassan in his office, he questioned plaintiff about her personal life while holding her hand. Again, this alleged incident involved unwelcome physical contact, as well as alleged verbal harassment. Although

13

plaintiff identifies only two instances of sexual harassment, both involved unwelcome physical contact, they were within a week of each other, and the second was a longer and more significant encounter, suggesting an escalation of the harassment. Moreover, in addition to the direct comments made to plaintiff, another female staff member at Peck, Bonnie Shepard, asserts in her deposition that Hassan's suggestive gestures, sexually-oriented comments, innuendos and general behavior created an objectively hostile environment.[5] Although they may be less important in defining her work environment than the harassment plaintiff allegedly suffered firsthand, incidents "directed at others and not the plaintiff...do have some relevance in demonstrating the existence of a hostile work environment." Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1144 (7th Cir. 1997).

The court agrees with the Board that several of the cases cited by plaintiff involve more serious assaults or more pervasive harassment than are alleged here. For example, the May 13 incident was less severe in some ways than the assault on the plaintiff in Smith, whose arm required surgery, although the assault was not explicitly sexual. The plaintiff in Smith also submitted affidavits from six female co-workers who reported being sexually harassed by the same defendant, while plaintiff here has only one relevant affidavit. Similarly, Hassan's harassment of plaintiff is less severe than that of the defendant in Shepherd v. Slater Steels Corp., 168 F.3d 998 (7th Cir. 1999), who repeatedly exposed himself to the plaintiff, masturbated in

---

[5]The court notes that it will not consider the affidavit testimony of teachers who worked with Hassan at other schools over a decade ago regarding Hassan's alleged mistreatment of other women. Much of the testimony is double hearsay, and these incidents are not relevant to the work environment at Peck, or Hassan's treatment of plaintiff, who began working with Hassan in 2001.

front of him, and threatened to have anal sex with him. Cases like <u>Smith</u> and <u>Shepherd</u>, however, do not set the floor for the minimum level of severity or pervasiveness required; rather, it is a question of degree based on questions of fact best left to a jury.

Taking all of plaintiff's allegations as true, plaintiff has created a triable issue whether she was subjected to a hostile environment. Accordingly, the court denies the Board's motion for summary judgment as to Count II.

## III.     Sex Discrimination (Count IV) and Religious Discrimination (Count V)

An employee alleging either sex or religious discrimination may proceed by presenting direct evidence of discriminatory intent or by using the <u>McDonnell Douglas</u> burden-shifting method. <u>See</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Plaintiff has not provided any direct evidence of discriminatory intent, and therefore she must establish a <u>prima facie</u> case of discrimination. To do so, plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) at least one similarly situated employee, not in her protected class, was treated more favorably. <u>Wyninger v. New Venture Gear, Inc.</u>, 361 F.3d 965, 978 (7th Cir. 2004). Because the analysis is the same, the court will consider Count IV and Count V together, and concludes that plaintiff fails to establish both the second and fourth elements of a <u>prima facie</u> case of sex or religious discrimination.

First, plaintiff has failed to prove that she was meeting her employer's legitimate business expectations, which the second element of <u>McDonnell-Douglas</u> requires to prove a <u>prima facie</u> claim. Although plaintiff complains that her termination was the result of discrimination,

15

plaintiff was terminated for falsifying her teaching certification application. While the parties squabble over the exact categorization of plaintiff's Ohio convictions - felony or misdemeanor, one count or multiple counts - this level of precision is not required. It is undisputed that plaintiff was convicted of a crime prior to filling out her application for teaching certification in September 1987, on which she falsely denied that she had ever been convicted of a crime. Although her appeal was still pending in 1987, her convictions had been affirmed when she applied to the Illinois State Board of Education in 1990, and her Ohio certification had been revoked a year earlier. Nonetheless, plaintiff responded in the negative when asked on the 1990 application if she had: (1) been convicted of a felony; (2) ever had a certificate suspended; and (3) ever had a certificate revoked. Her responses were indisputably false, and violated CPS's Disciplinary Code. Plaintiff's termination, therefore, was based on a legitimate, non-discriminatory reason.

Even if the court found that plaintiff was performing her job satisfactorily, she also fails to establish the fourth prong of a prima facie case. Although plaintiff alleges in her first amended complaint that similarly situated male and Muslim employees were treated more favorably than she, plaintiff provides no evidence at all of any employee who is directly comparable to her in all material respects, or one who was similarly situated, but received better treatment, as required to satisfy the fourth prong. See Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002).

The court agrees with the Board that plaintiff misreads and distorts well-established Seventh Circuit case law when she argues that the court can "assume" that a plaintiff establishes a prima facie case and proceed directly to the question of pretext. In several of the cases cited by

plaintiff the court began with the pretext analysis only because the defendant had conceded plaintiff's prima facie case or argued only pretext grounds based on specifics facts of the case that are not present here. See Vakharia v. Swedish Covenant Hospital, 190 F.3d 799, 807 (7th Cir. 1999). The Board has made no such concession in the instant case, and the Board specifically argues that plaintiff was not meeting reasonable expectations. In other cases cited by plaintiff, the expectations prong was not considered because the alleged harassers were responsible for reviewing the plaintiff's performance and singling plaintiff out for harsher treatment. See Oest v. Ill. Dept. of Corrections, 240 F.3d 605, 612 n.3 (7th Cir. 2001); Curry v. Menard, 270 F.3d 473, 477-78 (7th Cir. 2001). Here, the Board, not Hassan, was responsible for the investigation and her termination, and plaintiff does not argue she was singled out from other employees committing similar misconduct.

The fact that the Board advances a similar argument regarding the prima facie case and pretext, namely that plaintiff was not meeting her employer's legitimate expectations, does not permit the court to collapse the analysis as plaintiff suggests. Because plaintiff fails to establish the second and fourth prongs of a prima facie case of sex or religious discrimination, the court need not reach the pretext analysis, although the court notes that it would fail for the reasons stated above. The Board's motion for summary judgment is granted as to Count IV and Count V.

## IV.    Retaliation (Counts VI-IX)

Counts VI through IX of plaintiff's first amended complaint allege that the Board retaliated against her for lodging a variety of complaints related to the May 13, 2002, incident of alleged sexual harassment by Hassan. Plaintiff claims that the Board investigated and

17

substantiated allegations of child abuse against plaintiff, investigated plaintiff's false statement on her application for teaching certification, suspended her without pay pending her termination hearing, and ultimately terminated her in retaliation for complaints she made to Corinne Leak, the Board's Title IX Officer, the EEOC, the Board's inspector general, and her filing of the instant complaint.

Like a discrimination claim, a plaintiff may pursue a retaliation claim by either the direct or indirect method. See Haywood v. Lucent Tech., Inc., 323 F.3d 524, 531 (7th Cir. 2003). Because plaintiff has not presented any direct evidence of causal connection between her protected activity and the investigations, her suspension, or her ultimate termination, the court assumes she is proceeding under the indirect method. An employee may establish a prima facie case of retaliation under the indirect method by showing that: (1) she engaged in statutorily protected activity; (2) she performed her job satisfactorily; (3) despite her satisfactory job performance, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. Id. Here, plaintiff's retaliation claims fail for the same deficiencies that are fatal to her discrimination claims. She cannot establish that she was meeting her employer's reasonable expectations, and she presents no evidence of similarly situated employees who were treated more favorably.

As discussed above, there is evidence of legitimate, independent causes for all of the actions taken by the Board. The Board launched an investigation of plaintiff after parents called to report that plaintiff had mistreated their children. The Board's independent investigator, Connolly, substantiated the allegations, and plaintiff has presented no evidence to question his findings. While the court must accept any reasonable inference against the movant on summary

18

judgment, it need not accord weight to pure speculation. Fed. R. Civ. P. 56(c); Stop-N-Go of Madison, Inc. v. Uno-Ven Co., 184 F.3d 672 (7th Cir. 1999). Plaintiff merely speculates that the allegations were fabricated by Hassan, and in her deposition testimony accuses the Board's investigator of incompetence and bias. Plaintiff similarly characterizes the Board's investigation into falsified information on her certification application as "frivolous" and driven by retaliatory motives, but provides no support for this claim. Most significantly, plaintiff cannot dispute that the allegations that her application was fraudulent were substantiated by court documents from Ohio, and that she was terminated for her falsified application.

Plaintiff also fails to meet the fourth prong of the prima facie case for the reasons discussed above, in the court's discussion of her discrimination claims. The Board's motion for summary judgment is therefore granted as to Counts VI through IX.

## V.    Defamation (Count X)

In Count X of her first amended complaint, plaintiff alleges that Hassan made defamatory statements about her on several occasions, including that she was a child abuser and a racist. Plaintiff's first amended complaint makes reference to only one specific instance of alleged defamation, which she claims occurred at a staff meeting held at Peck on June 5, 2002. Plaintiff was not at the June 5 meeting, but contends that Hassan made five statements about "a teacher in this school," which plaintiff alleges referred to her and were defamatory. Plaintiff's statement of uncontested facts contains many more specific instances of alleged defamation. Defendant Hassan addresses a number of these allegations in his motion for summary judgement. In plaintiff's reply, however, she focuses on two categories of alleged defamatory statements only:

19

(1) Hassan's accusations that plaintiff was a child abuser; and (2) Hassan's accusations that plaintiff offered potential witnesses money in exchange for testimony. The court will assume that plaintiff concedes that the other statements were not defamatory, and examines the merits with respect to these two categories of statements only.

To prove defamation, a plaintiff must show: (1) the defendant made a false statement about the plaintiff; (2) there was an unprivileged publication to a third party with fault by the defendant; and (3) the publication damaged the plaintiff. Krasinski v. United Parcel Service, Inc., 124 Ill.2d 483, 490 (1988). Words are considered defamatory per se under Illinois law if they: "(1) impute the commission of a criminal offense; (2) impute infection with a loathsome communicable disease; (3) impute inability to perform or want of integrity in the discharge of duties of office or employment; or (4) prejudice a party, or impute lack of ability, in his trade, profession or business." Beasley v. St. Mary's Hosp., 200 Ill.App.3d 1024, 1033 (5th Dist. 1990). A plaintiff need not plead or prove actual damage to his or her reputation to recover for a statement that is actionable per se. Van Horne v. Muller, 185 Ill.2d 299, 307 (1988).[6]

Plaintiff offers purported factual support for her allegation that Hassan accused her of being a child abuser in Plaintiff's Facts. The court agrees with Hassan that several paragraphs of Plaintiff's Facts, including many on which the plaintiff relies in her defamation argument, cite to affidavits and portions of deposition testimony that contain inadmissible hearsay. Eisenstadt v. Centel Corp., 113 F.3d 738, 742 (7th Cir. 1997); Malec v. Sanford, 191 F.R.D. 581, 585 (N.D.Ill.

---

[6]Plaintiff does not argue that any of the statements are defamatory per quod and fails to plead special damages, as required in a per quod defamation claim. See Jones v. Sabis Educational Systems, Inc, 1999 WL 1206955, at *7 (N.D.Ill. Dec. 13, 1999). Therefore, plaintiff's defamation claim must rest solely on the per se theory of defamation.

March 7, 2000). Plaintiff also cites to statements in her deposition testimony that she admits she made without personal knowledge, and are therefore inadmissible. Fed. R. Civ. P. 56(e); Joseph P. Caulfield & Associates, Inc. v Litho Prods., Inc., 155 F.3d 883; 888 (7th Cir. 1988).

Most significant to her defamation claim, paragraphs 159 through 164 of Plaintiff's Facts contain double and triple hearsay, as well as speculation about conversations and meetings Hassan had with third parties. The third parties either offer no testimony at all, or do not offer direct testimony in support of plaintiff's claims. For example, paragraph 160 of Plaintiff's Facts states, "Steve Mance told Dianne Fieldler that Okab Hassan told him that 'Kay Marchioni is a racist and a child abuser and she needs to get out of the school, she's an evil person." In support of this statement, plaintiff cites to her own deposition testimony, and does not attach testimony or affidavits from Mance or Fieldler.[7] Similarly, paragraph 162, which states that Hassan "told parents that they were attending a meeting because of plaintiff's 'abuse to their children,'" is inadmissible because plaintiff was not at the meeting, and she presents no testimony from anyone who was present. The court will not consider these paragraphs of Plaintiff's Facts.

Plaintiff's only allegations of defamation for which she offers admissible evidence concern a memo and a letter written by Hassan. The court considers these two documents only. The memo, dated June 11, 2002, was addressed to the president of the Board and several other supervisors. In the memo, Hassan states that plaintiff was "abusing children within the system," and that Hassan had the evidence at Peck to support her dismissal. The second document that

---

[7]The court notes that Hassan attaches a copy of Fiedler's deposition to his reply to plaintiff's response to Hassan's statement of uncontested facts, which contains no reference to the hearsay statement cited by plaintiff.

contains allegedly defamatory statements by Hassan is a letter dated February 28, 2003, and addressed to the Principals' Association, with copies to the CEO of CPS, the chief education officer of CPS, the president of the Board, and an area education officer. Hassan stated in the letter that plaintiff was in the process of being dismissed for "abuse of children" and that plaintiff and a police sergeant had contacted school employees and "were offering them money in return for false testimony."

The statements in the letter and the memo regarding child abuse are not defamatory, however, because they are substantially true. "Truth is a defense, indeed the ultimate defense, to any action for defamation." Bradley v. Avis Rental Car System, 902 F. Supp 814, 820 (1995), citing Pope v. Chronicle Publishing Co., 891 F. Supp. 469, 474 (1995). Further, only "substantial truth" is required for this defense, and when no reasonable jury could find that substantial truth had not been established, the question is one of law. Wynne v. Loyola Univ. of Chicago, 318 Ill.App.3d 443, 451-52 (1st Dist 2000). The Board's investigation, which was ongoing at the time Hassan wrote the June 11, 2002, memo, substantiated the charges of child abuse against plaintiff. Plaintiff's dismissal hearing included testimony by several of plaintiff's former students that during the 2001-2002 school year she referred to students as "stupid," "dumb," and "fat," that she threw an eraser at students, and that she instructed one student to throw-up on another student. At the time Hassan wrote the February 28, 2003, letter the Board had approved twelve dismissal charges against plaintiff, including that she physically and

verbally abused students in her class.[8] Hassan's statements regarding child abuse by plaintiff were substantially true and not defamatory.

The remaining allegedly defamatory statement is Hassan's statement in the February 28, 2003, letter that plaintiff offered witnesses money. The dismissal charges against plaintiff did not contain an allegation that plaintiff offered witnesses money in exchange for testimony, this allegation was not a subject the investigation, and Hassan presents no evidence to support the truth of this allegation. Because this single statement accuses plaintiff of a crime and was published to third parties by Hassan, and was not substantially true, it was defamatory per se.

Once a statement is found to be defamatory the court inquires as to whether one or more privileges, including the privilege for statements made in a judicial proceeding, shelters the defaming party from legal action. Hassan argues, and the court agrees, that he is shielded from liability for defamatory statements by the judicial proceedings, or litigation, privilege set forth in section 587 of the Restatement (Second) Torts (1977)("Restatement"). The scope of the privilege is set forth in section 587 of the Restatement, which provides in pertinent part:

> "A party to a private litigation...is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding." Restatement (Second) of Torts §587 (1977).
>
> Illinois courts have embraced section 587 of the restatement, which protects parties to

litigation from defamation actions stemming from statements made during the course of judicial

---

[8]The court agrees with Hassan that the administrative law judge's failure to reach the issue of the child abuse allegations in plaintiff's termination hearing after finding other grounds for her termination does not impact the truthfulness of Hassan's statements.

proceedings if the statements have some relation to the proceedings. Thompson v. Frank, 313 Ill.App.3d 661, 664 (3rd Dist. 2000). The privilege will attach even where the defamatory statement is not confined to specific issues related to the litigation, and all doubts should be resolved in favor of finding pertinency. Malevitis v. Feldman, 323 Ill.App.3d 1129, 1131 (1st Dist. 2001) (citations omitted). Once the state court determines that the underlying statement is related to the litigation, there can be no defamation action regardless of a party's "motive or the unreasonableness of his conduct." Id.

The litigation privilege bars plaintiff's defamation claim in the instant case because Hassan's February 28, 2003, letter was written during the pendency of plaintiff's federal lawsuit against Hassan and the Board filed on January 6, 2003, and the defamatory statement was pertinent to the litigation. Hassan states in his affidavit that after plaintiff's lawsuit was filed, "it was brought to [Hassan's] attention by an employee at Peck School that plaintiff and her agent(s) were attempting to secure false testimony against [Hassan] and the Board in connection with this lawsuit using the promise of future monetary awards," and that he was prompted by the implications of plaintiff alleged actions regarding the pending lawsuit to share his concerns with the Board and the Principals' Association.

Plaintiff's lawsuit contains many serious allegations against Hassan of illegal, unprofessional, and unethical acts, which have the potential to significantly impact his employment as a school principal. The February 28, 2003, letter was addressed to the Principals' Association. It is uncontroverted that the Principals' Association represents Hassan in matters related to his employment as a school principal, a position that is surely implicated by the allegations against Hassan in plaintiff's lawsuit. The letter was copied to the Board which, in

24

addition to being a co-defendant in this action, is Hassan's employer and therefore certainly concerned with allegations of professional misconduct by Hassan. There is no allegation that Hassan made this defamatory statement to anyone other than the recipients of the letter. Further, plaintiff made her allegations against Hassan public, by including them in her federal lawsuit. A defendant maintains the right to respond to such attacks on his professional reputation and integrity in communications with his employer and his employment representative, as Hassan did in the February 28, 2003, letter.

The purpose of the litigation privilege is to enable attorneys to represent their clients - and clients to advance their own positions - zealously, without threat of civil liability. NSB Technologies, Inc. v. Specialty Direct Marketing, Inc., 2004 WL 1918708, at *3 (N.D.Ill. Aug. 20, 2004); see also RESTATEMENT (SECOND) OF TORTS § 587 cmt. a (1977). The policy reasoning behind the litigation privilege applies with particular force to the instant case, where the statement related to the credibility of potential witnesses in the pending lawsuit. As stated above, Hassan limited his publication of the defamatory statement to his co-defendant and his employment representative. Hassan had a legitimate interest in informing each recipient of the letter of issues related to the credibility of plaintiff and other witnesses in the case, and is shielded by the litigation privilege from tort liability for defamation for a statement made in furtherance of the defenses raised by the Board and him.

Because the court finds that the statement regarding securing false testimony contained in Hassan's February 28, 2003, letter is the only defamatory statements cited by plaintiff, and that it

was an absolutely privileged communication under section 587 of the Restatement, Hassan

motion for summary judgment is granted as to Count X.[9]

## VII.    First Amendment §1983 Retaliation (Count XII)

In Count XII of her first amended complaint, plaintiff alleges that the Board and Hassan

retaliated against her after she made complaints about Hassan to Sullivan, the inspector general

of the Board, including that Hassan was improperly soliciting donations from staff members at

Peck and misusing school funds.

A claim under section 1983 for retaliation in violation of First Amendment rights in the

public employment context requires a three-step analysis. Metzger v. DaRosa, 367 F.3d 699, 702

(7th Cir. 2004). First, under the "Connick-Pickering balancing test," the court must determine

whether the speech was constitutionally protected. Id. Under Connick-Pickering the court must

determine whether the speech addressed a matter of public concern; if the speech did involve

such a concern, the court then must determine whether the government's interest as an employer

in providing effective and efficient services outweighs the employee's interest as a citizen in

commenting upon the matter of public concern. Id.; see also Connick v. Myers, 461 U.S. 138

(1983); Pickering v. Bd. of Educ., 391 U.S. 563 (1968). If the speech was constitutionally

protected, then the plaintiff must prove that the defendant's actions were substantially motivated

_____

[9]Hassan also argues two bases for immunity from tort liability for his statements: (1)
section 2-201 of the Illinois Local Governmental and Governmental Employees Tort Immunity
Act ("Tort Immunity Act"), 745 ILCS 10/2-201, and (2) common law immunity for government
officials acting within the scope of their duties. It appears that Hassan is entitled to immunity
under both of these theories, but the court need not reach these issues because the court finds that
the statement was privileged.

by the plaintiff's constitutionally protected speech. Finally, the defendant has an opportunity to establish that it would have taken the same action in the absence of the plaintiff's exercise of his rights under the First Amendment. See Sullivan v. Ramirez, 360 F.3d 692, 697 (7th Cir. 2004); Kokkinis v. Ivkovich, 185 F.3d 840, 843 (7th Cir. 1999).

Plaintiff alleges that two adverse employment actions were motivated by her complaints to Sullivan: (1) her reassignment to non-classroom duties; and (2) her termination. Defendants concede that plaintiff's speech is constitutionally protected,[10] but argue that there is no evidence that the actions of the Board or Hassan were substantially motivated by the protected speech. For the reasons stated herein, the court rejects plaintiff's claims with respect to both actions.

Plaintiff was reassigned to non-classroom duties by Hassan on May 28, 2002, after parents of plaintiff's students alleged that plaintiff engaged in inappropriate and abusive conduct in her classroom. Hassan stated that he reported the abuse allegations to the Board, and was instructed to reassign plaintiff to non-classroom teaching duties, which included inventorying textbooks and monitoring school hallways and bathrooms. Defendants argue that there is no causal connection between plaintiff's reassignment and plaintiff's complaints to Sullivan, and offer two bases of support. First, defendants claim that Hassan was not aware on May 28, 2002, of plaintiff's complaints to Sullivan. Second, defendants proffer the child abuse allegations against plaintiff as a legitimate reason to remove her from the classroom.

---

[10]Although Hassan initially argued that plaintiff's speech is not constitutionally protected, he does not argue this in his latest submission. The Board has never argued that the speech is not constitutionally protected.

A causal connection cannot exist if the person allegedly responsible for the adverse action had no knowledge of the protected activity. <u>Pierce v. Runyan</u>, 1997 WL 269631, at *5 (N.D. Ill. May 14, 1997) (citations omitted). Hassan's action on May 28, 2002, cannot have been caused by plaintiff's speech to Sullivan if Hassan was not aware of the speech. Plaintiff argues that she informed Sullivan of the substance of her complaints during a telephone call on May 23, 2002, but offers no evidence that Hassan was aware of plaintiff's conversation with Sullivan when he removed plaintiff from her classroom on May 28, 2002.

Even if Hassan was aware of plaintiff's speech at the time he reassigned her, there was a legitimate, non-speech reason for his action. In a First Amendment retaliation claim, if the defendant can articulate a legitimate, non-speech reason for his actions, the plaintiff bears the burden of persuasion to show that the defendant's proffered reasons are pretextual, and that retaliation was the real reason behind the employment action. <u>See</u> <u>King v. Preferred Technical Group</u>, 166 F.3d 887, 893 (7th Cir. 1999). Here, Hassan argues that the abuse allegations against plaintiff were a legitimate reason for Hassan to remove plaintiff from her classroom pending an investigation, and that he was instructed to do so by the CPS Office of Schools and Regions. Plaintiff alleges that Hassan fabricated the abuse allegations, but offers no evidence to support this claim or any other evidence that the proffered reason for reassignment was pretextual.[11] Because there is no evidence of a causal connection between plaintiff's complaints to Sullivan

---

[11]The declaration of Wayne B. Giampietro ("Giampietro"), an attorney representing plaintiff in her State court appeal of the Board's administrative action, opining that the Board's treatment and ultimate termination of plaintiff violated her constitutional rights, is of no weight. Giampietro's statement is an opinion on a matter of law, not a statement of fact, despite plaintiff's inclusion of the statement in her statement of undisputed facts.

and Hassan's reassignment of plaintiff, and no evidence of pretext, the court grants summary judgment in Count XII with respect to plaintiff's reassignment to non-classroom duties.

Plaintiff argues that her termination was further retaliation by Hassan for her speech, but there is no evidence that Hassan was responsible for her termination, which was issued by the Board, and plaintiff concedes that the charges were brought by the Board. Only the Board, therefore, is potentially liable for plaintiff's termination. On February 7, 2003, nine months after plaintiff made her complaint to the inspector general, the Board brought dismissal charges against plaintiff, alleging twelve separate violations of the CPS's Employee Discipline Code, including verbal and physical abuse and falsifying employment application materials.

Even if plaintiff could articulate a causal connection between her speech and her termination, there is no evidence that the Board's proffered reason was pretextual. The Board cited several reasons for plaintiff's dismissal, including plaintiff's misrepresentation of facts on her application for teaching certification and abusive conduct in her classroom. George Larney, the hearing officer in plaintiff's dismissal hearing, found that there was just cause to terminate her based on the evidence that she had failed to disclose prior convictions.[12] Larney's written decision clearly states that he "is not reaching the issue of child abuse" because his findings regarding her failure to disclose her prior convictions on her certification application provide sufficient basis for her termination.

---

[12]Larney found that plaintiff lied on at least one, and potentially two, of her applications for certification. Although plaintiff attempts to muddy the waters by contesting the exact nature of her convictions, and noting that they were ultimately expunged, it is undisputed that she was convicted of three crimes in Ohio in 1987, her convictions were affirmed on appeal, her Ohio teaching certificates were revoked in 1988, and she affirmed on her 1990 Illinois application that she had never been convicted of a felony or had her teaching certification revoked.

Because plaintiff fails to offer evidence of a causal connection between her speech and her termination or that the Board's proffered reason for her termination was pretextual, the court grants summary judgment as to Count XII with respect to her termination

## **CONCLUSION**

For the reasons stated herein, defendant Board's motion for summary judgment is granted as to Count I, Counts IV through IX, and Count XII, and denied as to Count II. Defendant Hassan's motion for summary judgment is granted as to Count X and Count XII. The matter is set for status as to the remaining counts on October 26, 2004, at 9 a.m.

**ENTER:** **October 25, 2004**

**Robert W. Gettleman**
**United States District Judge**